It is unquestionable that written evidence is more certain than mere oral testimony, or, as it is commonly called, parol evidence. Hence follows the rule, which seems to be very generally admitted, that what is written shall not be contradicted, controlled, enlarged or explained by mere parol, unless it is shown that it is so written through fraud or by accident; which latter term embraces mistakes, surprise, or the like. There equity relieves upon a principle of equitable jurisdiction, not upon the writing, but on a thing, to wit, the fraud or accident dehors the writing, as Lord Thurlow expresses it in Irnham v. Childs, 1 Brown, 92; for equity relieves in cases of fraud, (440) accidents, and trusts. But the fraud here meant is not the fraud in not observing the contract, but that fraud by which the writing is made to speak a language different from the agreement; otherwise, it *Page 243 
would afford a ground of relief in all cases, and to obtain relief in such cases such a case must be made in the bill and, of course, supported by the proofs. But the great difficulty is to ascertain what is here meant by the written agreement. Is it confined to those writings professing, as it were, to evidence the written agreement, or does it embrace writings made for other purposes, diverso intuitu, ex gratia to execute them, and if the latter, to such of them as contain direct expressions of the agreement; or where the parol agreement is so inconsistent with the written agreement that both cannot stand together, or where such contradiction is not absolutely repugnant to or inconsistent with the writing, but the contradiction only a probable inference. The authorities are somewhat contradictory on the subject, and I have not the vanity to believe that I can reconcile or explain them by any examination that I could make of them. Nor do I deem it necessary in this case. But where the writing is of this latter description, and the parol evidence is not absolutely contradictory and repugnant to the writing, but the contradiction only a probable inference from the writing, I think that facts and circumstances
may be shown by parol. Whatever may be the law as to mere parol declarations is too well established, I think, by all the authorities, both ancient and modern, to be now questioned. They are collected by Mr. Buller in his note in Co. Lit., page 205a, note 96. They prove the correctness of his observation, that wherever a conveyance or an assignment of an estate is originally intended as a security for money, whether this intention appears from the deed itself or any other instrument, it is always considered as a mortgage, though there is an express agreement of the parties that it shall not be redeemable, or that the right of redemption shall be confined to a particular time, or to a (441) particular discription of persons. He then observes (which is to the point in this case) that "In many of these cases the courts have found it necessary not only to apply their general principles, but to determine the fact whether the conveyance was intended as an absolute sale or only as a security for money. If the money paid by the grantee was not a fair price for the absolute purchase of the estate conveyed to him; if he was not let in to the immediate possession of the estate; if instead of receiving the rents for his own benefit he accounted for them with the grantor, and only retained the amount of the interest; if the expense of preparing the conveyance was borne by the grantor: each of these circumstances has been considered by the courts as tending to prove that the conveyance was intended to be merely pignorititious." The cases from which he draws his observations are there cited, and they fully support him; and this seems to me to be conformable to principle. That it was not to be redeemable is matter of inference, not only expressed so in the deed, but inferred from it, on the presumption that if *Page 244 
there had been such an agreement the deed would not have been absolute. But this is not entirely inconsistent with the deed, but only a very strong probability, which it would be impossible to overturn by proof of inconsistent parol declarations; for they are liable to be misunderstood, forgotten, or misrepresented by fraud or perjury, or set up, where there was nothing of the kind, and are incapable of disproof. But facts from which the inferences are to be drawn are not more liable to these objections than almost all human things. There are some acts which, if done with deliberation, such as the one mentioned by Lord Talbot inCottrell v. Purchase, Cas. Temp. Talbot, 63, as settling an account wherein the money advanced is charged as a debt, and interest (442) stated. Now, it is possible that an absolute conveyance may be intended only as a mortgage or security for money; but it is impossible that there can be an absolute purchase and yet the purchaser retain the price. They both cannot stand together; the possibility yields to the impossibility; the absolute conveyance to the mortgage; for an absolute conveyance and intended as a mortgage, it may be; but an absolutepurchase and mortgage it cannot be. I wish it to be distinctly understood that I express no opinion on principles which I have not used to decide this case; for as to them I have not pushed the inquiry far enough to form an opinion on which I can confidently rely. But this much I will observe, that in the old cases there was too much laxity permitted in the introduction of parol evidence to interfere with written contracts. Writing then was not so common as at present, and their very inheritances were conveyed by mere words accompanied by livery of seisin, all which might be, and was very often, done without any writing at all. On the contrary, of late, since the statute of frauds, there has been too much strictness in excluding it, as we are apt to run into contrary extremes; and the legal notions of the lawyers of England have been insensibly affected by the operation of that statute, which places parol evidence in the background, and in many instances it has been said that independent of the statute parol evidence would be in the background, when in truth the notion of its inferiority was insensibly produced by the statute in the manner before mentioned; and it being of no moment how it was produced, provided it was so, the matter passed off without further examination. And even in this State, where we had no statute of frauds until very lately, the same effect has been, in a minor degree, produced; for we get our legal notions, or most of them, from English authorities, and principally from those written since the passage of the statute of frauds, and particularly as to the rules of evidence. This case was before the late Supreme Court in 1810,5 N.C. 449. I was a member of the Court and concurred with a majority that mere parol declarations should not be received to contradict the *Page 245 
deed. I did not doubt then, nor do I now, that facts might be (443) shown by parol from which it might be inferred that it was intended only as a security for money. In this opinion Judge Locke concurred. I have no distinct recollection of Judge Lowrie's opinion. The Court was composed of Judges Taylor (the present Chief Justice), Hall, Locke, Lowrie, and myself. Judge Wright, I think, was absent.
From my view of the case I do not deem it necessary to examine the ground taken by the gentleman who closed the argument, to wit, that although the parol declarations were not admissible to prove the transaction to be a mortgage, yet they were to prove it usurious. This was incomprehensible to me. I cannot, therefore, acquiesce in it, although I do not know that I can detect the fallacy of his very ingenious argument. But I have too much experience of the extent of the powers of my own mind not to have perceived that the arguments, the fallacy of which I cannot detect, do not always lead to the truth; and when to my understanding they tend to establish something contrary to what I have arrived at by a plain and simple argument, I conclude there is error in the argument, although I cannot point out where it lies.
This transaction cannot be made a loan without making the conveyance a mortgage; for if it was an absolute purchase, the lands passed to Jones and the money to Streator; there was no debt to forbear. The evidence must, therefore, be admitted to prove the mortgage; and if the evidence is admissible to prove it a mortgage to entitle the party to redeem, it appears to me to be admissible to prove the same fact for any purpose. If mortgage deeds were void, evidence to show it a mortgage would be admissible. But mortgage deeds are not void; only usurious mortgage deeds are void. Then as to the evidence, in which I do not take the parol declarations into consideration further than Jones admits them in his answer. The question then is, do the facts proven, taken in connection with Jones' two answers, (444) show the conveyance to be intended as a security for money? I think they do. (1) As to the value, the witnesses differ from 75 cents to $2.50 and $3. I am disposed to believe that the higher valuations are nearer right, first from the amount of the rent, as admitted by Jones; the estimate made of the injury done by Streator in two years, to wit, $400, and the estimate made of the injury done by Streator and Lane, $1,000; the amount for which Jones sold the land two years afterwards, to wit, $1,200; and the two years rent, to wit, $400, making in all $1,600. Now, it is impossible well to perceive how this estimate made by the witnesses Hunter and Sugg, could be correct, to wit, $975, and yet the land in so short a time, without any convulsions in nature, or any other particular cause, received an injury *Page 246 
of $1,000, particularly when the $975 estimate is supported only by two men, one of whom says that the land without the wood is worth nothing, and the other only 25 cents. With this estimate as to value, taken in connection with the rent, I am of opinion that the land was worth $2,600 or more. This disparity, together with amount of rent, and Streator's retaining possession, with Jones' answer to this bill, and another answer of his read on the hearing in another suit between Streator and himself, satisfy me that Streator never would have signed the deed unless it was understood, and formed part of the contract, that upon the repayment of the money he was to have the land again. Such total disregard of value, and the sacrifice consequent thereon, are contrary to the principles which almost invariably govern human actions, which, with the high rent and Streator's retaining possession, countervail any inference which can be drawn from the absolute form of deed. And, in truth, I think that such inference is supported by Jones' answer. He admits in it that an after-promise was made (but when, he cautiously conceals) that he would (445) resell, as he calls it. These resales, particularly when made immediately after the execution of the title deeds, should be strictly scrutinized. They are most frequently mere shifts or devices to cloak the real nature of the transaction and evade the statute against usury. They form at least one link in the chain. But the object of the bargain was not to acquire the property, but to make a profit of money; not that a person may not use his money to his profit and its increase by buying and selling, but it must be a real sale and transfer of right which, from their very nature, is not to be presumed; for why should a person really and bona fide purchase the property and in a moment after, without any cause, and before that foible of our nature, proneness to change, could exert its influence, part with it again? It is said the motive was to make money. It is admitted, and was so understood before the contract was closed, and formed part of it; and it is true there may be upon principle a sale made under such circumstances; but I have never known one, and they are so rare that I have never known a person who had. We have a full-drawn likeness of one in Jones' second answer, and if they be as he has drawn them, I wish never to witness one. But with all the aid of able counsel, the features of usury and oppression could scarcely be concealed; and if he means the same thing in his answer to this bill by a resale, as he did in that — and it is quite fair so to presume, for I believe he was the same being in both — very little evidence, much less than that offered in this case, would be sufficient to show the transaction to be a security for money only. *Page 247 
As to the other defendant, Lane, my impression is that he stands in the same situation as Jones, but it is not so strong that at present I would decree against him. In his favor he has the express declaration of Streator that Jones had a right to sell, and that if he, Streator, did not pay that year he gave up. Notice that Streator set up claim is sufficient, and if he undertook to judge of its validity, he did so at his peril; and I rather think he should not protect himself (446) by an exposition of the contract (not a false statement of facts by Streator) which misled him, Lane, by a needy, necessitous man, and whose whole estate was under mortgage to the person whose vanity it flattered and whose pride it swelled. I say that I am not satisfied that he is protected by such means. He does not appear to be a bona fide purchaser; but at present I am not prepared to say that he stands in the place of Jones. Retain the bill also as to him for further directions.